IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

Plaintiff,

**Criminal No. 97-228 (JAF)**

v.

**JOSE RAMON HERNANDEZ**,

Defendant.

### UNITED STATES' MOTION REGARDING PROCEDURAL POSTURE OF CASE AND REQUEST FOR A NEW TRIAL HEARING

**COMES NOW**, The United States of America, by and through the undersigned attorneys and, respectfully states and prays as follows:

### Procedural Background

José Ramon Hernández (hereinafter "Hernandez" or "defendant"), along with three other co-defendants, were the subject of a five count Superseding Indictment rendered by the District of Puerto Rico Grand Jury on December 30, 1997. José Ramon Hernández was charged in all five counts and co-defendant Douglas Gorbea in Counts One, Two, Four and Five.

On September 3, 1998, the jury returned a verdict of guilty as to both defendant Hernández and co-defendant Gorbea. Hernández was found guilty as to Counts One through Five of the Superseding Indictment. Gorbea was found guilty as to Counts One, Two, Four and Five.

On January 8, 1999 defendant José Ramon Hernández was sentenced to a term of imprisonment of 293 months as to each count, to be served concurrently, a term of supervised release of five (5) years and a special monetary assessment of $100 for each count. Judgement was entered on January 26, 1999. On July 17, 2000, the First Circuit Court of Appeal *affirmed* the conviction and sentence of Hernández and Gorbea. United States v. Hernández v. Gorbea, 218 F3d

2

58 (1ˢᵗ Circuit 2000).

On July 30, 2000, Hernández filed, pro se, a Petition for Rehearing En Banc which was denied. Subsequently, Hernández filed a Petition for Writ of Certiorari in the Supreme Court which was also denied. Hernández v. United States, 531 U.S. 1103, 121 S.Ct. 840 (January 8, 2001).

On December 31, 2001 the above named defendant filed a Motion Under 28 U.S.C. § 2255 seeking to vacate, set aside or correct the sentence imposed by this Honorable Court on January 8, 1999 in Criminal No. 97-228 (PG). (Civil No. 01-2746). On May 6ᵗʰ, 2002 Honorable Magistrate Judge Aida Delgado emitted a Report and Recommendation regarding defendant's motion and for the reasons set forth in the report, recommended that the petition be dismissed and denied. On June 11, 2002, this Honorable Court adopted the recommendation of the Magistrate Judge, and defendant's motion was denied. A Judgement was entered on that date wherefore Civil No. 01-2746 was dismissed with prejudice.

Subsequently, on July 16, 2002, José Ramón Hernández filed a Motion for New Trial under Rule 33 alleging newly discovered evidence. The alleged newly discovered evidence is an Affidavit from co-defendant Douglas Gorbea who when on trial with petitioner José Ramón Hernández exercised his right to remain silent and not to testify on behalf of himself or the petitioner José Ramón Hernández. On September 25, 2002 defendant filed an Addendum to his Rule 33 Motion to include allegations concerning his trial counsel Teodoro Méndez.

The United States filed an opposition to defendant's motion, and the Honorable Magistrate Judge Aida Delgado Colon held two hearings to consider the evidence. During the hearings the Magistrate heard testimony from the defendant as well as the United States. On June 29, 2004, the Magistrate issued a recommendation that defendant be granted a new trial based on newly discovered evidence. Petitioner's motion based on an alleged Brady violation was denied. On June

30, 2004, the Magistrate issued a supplement to the June 29, 2004 Report and Recommendation.

On July 12, 2004, the United States filed an objection to the Magistrate Judge's Report and Recommendation. On December 22, 2004, and without holding an evidentiary hearing, the Honorable Juan M. Perez Gimenez issued an Opinion and Order denying defendant's request for a new trial. On that same date, defendant filed a notice of appeal with the First Circuit Court of Appeals. After hearing oral argument on behalf of the parties, on April 18, 2006, the First Circuit Court of Appeals reversed the district court's ruling and remanded the case for further proceeding with a new district court judge.

On July 10, 2006, the case was randomly assigned to the Honorable Aida M. Delgado-Colon. Judge Delgado-Colon held a status conference on the case on July 21, 2006. At the status conference, and based on our interpretation of the First Circuit's Order, the United States indicated that it believed that the case was before the Court for a final resolution of the pending motion for new trial. While counsel for defendant argued that the case was before the Court for the setting of a new trial, and or plea bargain.

Given the conflicting interpretations of the parties, the United States requested clarification from the First Circuit Court of Appeals regarding the current procedural status of the case. On August 4, 2006, the First Circuit Court of Appeals issued an Order that read in pertinent part as follows:

> [w]e clarify that we remanded this case for the district court to determine whether to accept the magistrate judge's credibility determination. If the district court accepts the magistrate judge's credibility determination, it should conduct a new trial. If the district court chooses not to accept the credibility determination of the magistrate judge, the court must hear the witness testify first-hand and make its own credibility determination before determining whether a new trial is merited.

4

Based on the clarification from the Court, the United States submits that this Honorable Court should hold a hearing to assess the credibility of defendant's witness, Douglas Gorbea, in Order to make a determination as to whether a new trial should be granted in this case. Below is the United States' factual arguments and legal reasoning for said request.

## Factual Background

The summary of facts included herewith is derived from the opinion rendered by the First Circuit Court of Appeals in United States v. Hernández, 218 F.3d 58 (1st Cir. 2000).

On September 27, 1997, U.S. Customs officials received information that a particular container, which was expected to arrive at the Crowley Yard in San Juan, Puerto Rico, contained contraband. The container had been shipped by sea from Venezuela. Customs officials located the container the next day, placed an electronic hold on it, and moved it to Customs facilities in Cataño for inspection. The bill of lading indicated that the container held disposable plastic cups, that the consignee was a supermarket, and that the consignee's representative was South Atlantic Trading Company (SATCO). Defendant Gorbea was one of the owners of SATCO and ran its business. He was listed as the person to be notified of the container's arrival. On unloading the container, Customs agents discovered that some of the boxes of plastic cups contained bricks of cocaine. All in all, the agents removed 7,514 pounds (a gross weight of approximately 3,415 kilograms) of cocaine from the container. Approximately 141 of the 830 boxes in the container contained cocaine. The Customs agents repacked the container, leaving approximately 24 pounds (10 kilograms) of cocaine in it. The agents installed electronic equipment that allowed them to track the container's location and to determine whether it had been opened. The container was returned to the Crowley Yard, where it was placed under 24-hour surveillance.

On September 29, defendant Gorbea called the Customs office, identified himself as the

owner of the container, and asked why the container had been taken to Cataño for inspection. He was told that there was no problem with the container and that he could pick it up later that day.

Around October 1, Gorbea went to the customs broker and arranged for payment of the freight charges associated with the container. An employee of the customs broker said that Gorbea was in a hurry to receive this shipment. In fact, Gorbea had instructed his secretary to call the customs broker several times to "see what the status [of this shipment] was and to hasten them." The customs broker completed the necessary paperwork by the next day, October 2. That day, two employees of J.R. Transport, a company owned by defendant Hernández, arrived at Crowley Yard to pick up the container. The driver, Alain Ruiz-Galindez, retrieved the container and drove it out of Crowley Yard.

The truck stopped several times during its route, sometimes remaining stopped for half an hour or more. A trip that the district court judge estimated would normally take about half an hour to make took about four hours. At times when some of the other cars on the road had their headlights on, the truck drove without its headlights. Hernández followed the truck in a gray van from the time it left Crowley Yard. During one of the stopovers, Hernández emerged from the gray van and got into the truck with Ruiz-Galindez. Hernández remained in the truck for the duration of its trip and, at some point, the gray van stopped following the truck. Eventually, the truck arrived at J.R. Transport's truck yard. One of the officers following the truck reported that a number of people in a Crown Victoria arrived at J.R. Transport around the same time. He reported that one of the passengers in the Crown Victoria appeared to be giving orders and that one of the passengers was holding a "dark, black long object." The individuals in the truck yard greeted and congratulated one another once the container was moved into the lot.

After watching the people and cars coming and going into the truck yard, the officers moved

in. Arrests were made and the container was seized. It had not been opened.

Gorbea was arrested in December. At the time of his arrest, a document was found in his briefcase. It was a fax dated February 5, 1997, from a Marina Kassert in Venezuela to Gorbea regarding an earlier shipment of plastic cups. It said, "I urgently need the information of your friend that has the truck to square everything with him." On the back of the fax, Gorbea had written the name Jose Hernández.

At the time of the cocaine shipment, Gorbea's company was primarily in the business of importing crackers. Another trucker was used for transporting the shipments of crackers. Although this trucker hauled some shipments of plastic cups, the evidence suggests that Hernández's trucking company was used only for plastic cup shipments.

### Objections to the Magistrate's Report and Recommendation

The Government does not contest the fact, nor could it, that petitioner has presented evidence that other Jose Hernandez were employed by Crowley and/or its subsidiaries during the relevant time frame of this case. (Report and Recommendation, p. 18). Instead, the Government objects to the weight the Magistrate gave to the testimony of Douglas Gorbea, petitioner's convicted codefendant. In addition, the Government objects to the Honorable Magistrate Judge's ultimate conclusion that the ". . . new evidence [was] sufficient to likely create reasonable doubt to an extent a jury could have decided to acquit." (Report and Recommendation, p. 24).

### Discussion

Federal Rule of Criminal Procedure 33 governs a defendant's motion for new trial based on newly discovered evidence, and states:

> [o]n a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require. If trial was by a court without a jury, the court may-on defendant's motion for new trial-vacate the judgement, take additional testimony,

>and direct the entry of new judgement. A motion for new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty. But if an appeal is pending, the court may grant the motion only on remand of the case. A motion for new trial based on any other grounds may be made only within 7 days after the verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

Fed. R. Crim. P. 33. In the case at bar, defendant has filed a motion for new trial based on alleged newly discovered evidence, which was not available at the time of trial.

"Generally under Rule 33, a defendant who seeks a new trial based on newly discovered evidence must show that: '(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.'" United States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001)(citing United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)). A defendant's failure to meet any of the elements requires a denial of his motion. See United States v. Falu-Gonzalez, 205 F.3d 436, 442 (1st Cir. 2000).

Although there is differing circuit authority on the precise issue of whether or not exculpatory affidavits from co-defendants who did not testify at trial because they exercised their Fifth Amendment privilege qualifies as newly discovered evidence within the meaning of Rule 33, the First Circuit Court of Appeal has long held that the "'newly discovered' language of Rule 33 encompasses evidence that was unavailable." United States v. Montilla-Rivera, 115 F.3d 1060, 1066 (1st Cir. 1997); see also Vega Pelegrina v. United States, 601 F.2d 18, 21 (1st Cir. 1979). In addition, the United States agrees that a co-defendant, who could possibly provide exculpatory evidence, but who exercises his constitutional right not to testify at trial, is deemed "unavailable" under said precedent. Id.

8

As we will now explain, the United States submits that petitioner's newly discovered evidence is neither facially material to the guilty verdict, nor would it probably result in the acquittal. The newly discovered evidence consists of a sworn declaration and testimony by co-defendant Douglas Gorbea, stating that the fax containing the name Jose Hernandez does not reference the petitioner in this case, but instead, refers to another Jose Hernandez, a Crowley employee with whom Gorbea had spoken on that day.  Moreover, Gorbea claimed that petitioner Jose Hernandez was not his personal friend, but that he was merely someone with a trucking service having cheaper rates that Gorbea's usual trucker.

In sum, after exhausting all other avenues, petitioner now seeks to introduce a sworn declaration and testimony of a convicted coconspirator, who also maintains his innocence, to establish his purported right to a new trial and his "actual innocence."  Before addressing the merits of the motion, the United States calls the Court's attention some pertinent language from the First Circuit Court of Appeals on the scrutiny such motions should be given: **"[a]ppellant does submit an affidavit from Gleason [a codefendant] which, if believed, would dissociate appellant from the crime altogether.  This is the weakest sort of evidence, and the district court, which conducted the original trial, was certainly within its discretion in disbelieving it.  Indeed, if a new trial could be predicated as of right upon a codefendant's change of heart after a failure to take the stand there could always be a second chance for everyone."**  Dirring v. United States, 353 F.2d 519, 520 (1st Cir. 1965).  We now turn to defendant's specific arguments.

Petitioner's argument regarding the newly discovered evidence is that the name Jose Hernandez written on the back of the facsimile is not the same Jose Hernandez charged in this case. Specifically, petitioner claims that the government used false evidence and perjured testimony to implicate petitioner as the same Jose Hernandez whose name appeared written on the back of the

fax found in Gorbea's briefcase when arrested.  Moreover, petitioner claims that the Jose Hernandez named on the back of the facsimile transmission is that of another Crowley employee with whom Gorbea had spoken on the date of the transmission, and that he did not meet his co-defendant Gorbea until they were arrested.  Finally, petitioner argues that without the facsimile transmission, the government's evidence would be insufficient to find his guilt beyond a reasonable doubt.

The United States first addresses petitioner's argument regarding the proper identity of Jose Hernandez.  The disputed evidence, a facsimile transmission sent by Gorbea's contact in Venezuela (Kassart) to Gorbea, and was used by the United States at trial to assist in proving a criminal association between Hernandez, Gorbea, and Kassert.  In the fax, Kassert informed Gorbea that she urgently needed "the information of your friend that has the truck to square everything away with him."  On the back of the fax, Gorbea wrote the name Jose Hernandez.

The United States submits that Gorbea's testimony should be considered very carefully for the reasons that follow.  During the evidentiary hearing, Gorbea testified that the first time he met petitioner was after his arrest and while they were held at MDC Guaynabo.  (Docket #202, p. 40).  Moreover, Gorbea testified that he did not really know petitioner until they were arrested and in jail.  (Id. at 17).  Finally, Gorbea testified the he and petitioner were currently incarcerated together at Colman Federal Prison Facility in Orlando, Florida and it was there that he told petitioner that he would have testified on behalf of petitioner at trial.

The first problem is that this testimony is contradicted by other evidence on the record.  The United States first points to the affidavit by Hernandez' trial attorney Teodoro Mendez-Lebron.  During the Title 18, United States Code, § 2255 proceedings, Attorney Mendez-Lebron made it clear that attempts were made to solicit the testimony from Gorbea.  In his affidavit, Mendez-Lebron states that:

> [i]n the pretrial meetings which Defendants Gorbea and Hernandez had with their counsel it was agreed that Defendant Gorbea would take the stand and testify in a way favorable to both him and Hernandez. However, when the government rested its case Gorbea had made up his mind, and refused to testify although his counsel advised him to do so and explained to him that the defense needed his testimony to convey to the jury the fact that the defendants had no knowledge at all about the presence of cocaine in the container.

(Docket # 179, ex. A). Thus, it is clear that Gorbea's statement that he would have testified on behalf of petitioner is contradicted by Attorney Mendez-Lebron's affidavit, which makes it abundantly clear that attempts were made to convince Gorbea to testify on behalf of himself and petitioner.[1] This fact alone, casts serious doubts concerning Gorbea's credibility, and highlights the First Circuit's concern about a co-defendant's change of heart creating a second chance for everyone.

Another problem with Gorbea's current version of events, is the fact that according to Gorbea's theory and testimony, he had information that he could have and would have provided to the jury that would have eliminated the knowledge, or *mens rea,* element for petitioner. This contention is seriously flawed for the following reasons. First, Gorbea maintains that he did not have any knowledge about the massive load of narcotics in the container, and he continues to maintains his actual innocence. Moreover, Gorbea testified that he never told Hernandez what was in the truck. (Docket #202, p. 25 & Report & Recommendation, p. 7). Thus, according to Gorbea, petitioner "did not have any reason to know about the drugs in the container, either from him or anybody that Gorbea locally knew or from anyone from Venezuela." (Docket #202, p. 25 & Report & Recommendation, p. 7). Assuming Gorbea's theory events, the following scenario is factually

---

[1] The United States does not raise this argument for the proposition that the newly discovered evidence, to wit: the testimony of Douglas Gorbea, was available to petitioner at trial. Instead, the Government raises this argument to call into doubt the credibility of Gorbea.

accurate: (1) a large-scale cocaine transporter would put approximately 3,017 kilograms of cocaine in a container that was arranged to be sent in a cargo container, via motor vessel, from Venezuela to Puerto Rico; (2) the large-scale cocaine transporter would place the 3,000 kilograms of cocaine in a cargo container of an individual (Gorbea) that did not know that the narcotics were concealed therein; (3) the large-scale cocaine transporter would allow the unwitting transporter (Gorbea) to arrange the transportation of the cargo container once it arrived to Puerto Rico, and (4) the large-scale cocaine transporter would allow the unwitting sea transporter of his or her narcotics to hire the untrusted, and unwitting lowest bidder (petitioner) to transport the 3000 kilograms of cocaine to its destination in Puerto Rico. There is no dispute that in excess of 3000 kilograms of cocaine were shipped from Venezuela to Puerto Rico. However, according to Gorbea's theory of the case, neither the man who arranged for the sea transportation (Gorbea), nor the person in charge of the ground transportation (petitioner) were aware of the fact that they were in fact transporting millions of dollars worth of illegal narcotics. Essentially, according to Gorbea, both he and petitioner were merely pawns that were duped, and thus, wrongly convicted.

Moreover, if it is in fact true that petitioner had not met Gorbea prior to their arrest, petitioner should have and most certainly would have put evidence forward that it could not be his name mentioned on the back of the facsimile transmission because he had not met Gorbea when the facsimile was transmitted. Second, if defendant's argument is to be given any weight by this Honorable Court, he should be required to produce evidence, in the form of an affidavit or sworn statement from the alleged Crowley employee, Jose Hernandez, regarding the alleged conversation with Gorbea on the day in question. Instead, he chooses to rely on the self-serving statement of his convicted codefendant, and a list of other Jose Hernandez that were employed by Crowley at the time of the drug transaction.

12

Finally, and most importantly, defendant's argument simply cannot stand in light of the overwhelming evidence regarding his participation in the drug importation. We begin with the evidence on October 2, 1997, when special agents were informed that the container was moving within the Crowley yard where it was stored. The trailer truck that removed the container from Crowley was red in color and had name "Papito" prominently displayed. Papito is the nickname of defendant Jose Ramon Hernandez. The truck used to transport the drug shipment was from J.R. Trucking in Catano, a lot owned by defendant Jose Ramon Hernandez.

In the alternative, even if defendant's argument regarding the proper identity of Jose Hernandez is believed, abundantly sufficient evidence remains to support his conviction beyond a reasonable doubt, and the result on retrial would not differ. For the Court's convenience, the United States will simply recount the other evidence presented against defendant at trial:

1. Prior to turning the drug-laden trailer over to Crowley Shipping, investigators had prepared the trailer for surveillance, the container was returned to Crowley Yard, and a 24 hour surveillance was henceforth in effect. (T. Tr.215).

2. The following day codefendant Gorbea called the Customs office and identified himself as the owner of the cargo. (T. Tr. 160).

3. Gorbea was informed that there was no problem, and that he could present the consumption entry and pick up the trailer at Crowley. (T. Tr. 160).

4. Gorbea was in a hurry to pick up the load, and so he personally went to the custom's broker to pay the freight charges. (T. Tr. 605).

5. The next day, the documentation was picked up by a trucker. (T.Tr. 610). The trailer was released on October 2, 1997. (T.Tr. 591-92).

6. Shortly thereafter, special agents were informed that the container was moving within the

13

Crowley yard, and ground and air surveillance quickly organized. (T.Tr. 216).

7. The truck that removed the trailer from Crowley was red in color and had the name "Papito" on the side. Papito is the nickname of defendant Jose Hernandez. (T.Tr. 220).

8. The truck was from J.R. Trucking in Catano, a lot owned by defendant Jose Hernandez. (T.Tr. 230).

9. Once it exited the container yard the truck proceeded towards the Naval Base. (T.Tr. 227). It parked before the entrance for about 20 to 25 minutes. (T. Tr. 231).

10. The container was followed by authorities and a counter-surveilling grey Chevrolet Astro van. Inside the van was defendant Jose Ramon Hernandez. (T.Tr. 248-250).

11. At some point, defendant Jose Ramon Hernandez exited this van and mounted the truck. (T.Tr. 248-250).

12. While en route, truck stopped for an extended period of time in the Hormigas Ward. The stop lasted twenty to thirty minutes. (T.Tr. 252-53). From there the truck headed to Caguas (T.Tr. 259), and moved along the highway in route to San Juan, exited the main road (Route 1) and took the route that converged to Road 20 near Guaynabo. From there the truck traveled to Catano. (T.Tr. 259-60, 306). The truck was driving, at night, with no headlights.

13. Before entering the trucking lot, defendant Hernandez, who was now accompanying the truck driver (T.Tr. 525-526), got out of the truck and asked the driver of another of the counter-surveilling vehicles to stop while the truck was taken into the lot.

14. The counter-surveilling vehicle, a champagne colored Crown Victoria with three individuals inside, immediately crossed behind the truck and parked on the pavement in front of the entrance. (T.Tr. 366).

15. The driver and a passenger of the Crown Victoria exited the car. The passenger had a

cellular phone, and started directing the individuals with hand gestures. (T.Tr. 370-73).

16. During this time, defendant Hernandez would come and go while continuous movement occurred. (T.Tr. 372).

17. The trailer was brought in reverse into the lot owned by defendant Hernandez, and the third passenger in the Crown Victoria opened the back door and stood holding a long, dark, black object. (T.Tr. 373).

18. Once the trailer was backed into the lot, the individuals involved in the transportation began to shake hands, celebrate, and congratulate each other. (T.Tr. 375, 393).

19. Hernandez was seen a couple of times after the container was parked inside the lot. (T.Tr. 524).

As stated above, the United States believes that defendant's argument about the identity of Jose Hernandez is immaterial. The United States has summarized other, material evidence indicating that: (1) defendant's truck was used to move the cocaine; (2) the cocaine shipment was taken to a trucking lot owned by defendant; (3) defendant began the journey with the drugs in a counter-surveillance Astro van; and (4) defendant was actually in the trailer when the drugs arrived at his trucking lot. The United States agrees with the First Circuit's assessment of the facts regarding Hernandez:

> Hernandez' best argument is that he only participated in the transport of the container from Crowley Yard to J.R. Transport truck yard and that he never opened the container, so he did not know what he was transporting. Nonetheless, a reasonable jury could infer his knowledge of the contents of the container and his participation in the larger scheme. The manner in which the container was transported in his company's truck was unusual, suspicious, and evasive, both while he followed the truck in the van, and while he was in the truck. Further, Hernandez acted as a look-out might, following the truck in his van and getting into the truck only after it was some distance from Crowley Yard . . . . The truck stopped a number of times along its route, taking hours to travel a distance the district judge estimated should take no more than half an hour. The truck engaged in evasive measures such as u-turns and

> driving without headlights.
>
> When the container eventually arrived at the truck yard, other individuals arrived, greetings and congratulations were exchanged, and what may have been a firearm was spotted. Ruiz-Galindez, Hernandez' employee and the driver of the truck, took part in the revelry over the seemingly successful delivery of the cocaine. A celebration of the arrival of plastic cups is hardly plausible . . . . This inordinate level of attention to the container makes probable Hernandez; knowledge of its contents and their value. This is something more than mere innocent presence at the scene of the crime . . . . This conclusion is bolstered by the fact that the container was taken to J.R. Transport lot, rather than directly to SATCO. Gorbea was willing to entrust this valuable and illicit cargo to Hernandez for more than the time necessary to drive it from Crowley Yard to SATCO.

Hernandez, 218 F.3d at 66, 67. This independent evidence linking Hernandez to the crime evidences the fact that a new trial would not probably result in a different result. Moreover, defendant does not contest any of this independent evidence.

Regarding defendant's final argument that he and Gorbea did not meet until after they were arrested, the United States very much doubts the veracity of this statement. However, even if it is true, as the Court is aware, the government need not prove the defendant knew the identity of all the participants in the conspiracy. See Blumenthal v. United States, 332 U.S. 539, 557 (1947).

### Request for Relief

Based on the foregoing, the United States submits that a hearing should be set where this Honorable Court can make a credibility determination regarding the newly discovered evidence in this case and issue a ruling regarding defendant's pending motion for new trial pursuant to Federal Rule of Criminal Procedure 33.

16

**WHEREFORE**, in view of the foregoing, it is respectfully requested that an evidentiary hearing be set so that this Honorable Court can make a credibility determination regarding defendant's newly discovered evidence. **RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 6th day of September, 2006.

**Rosa E. Rodriguez Velez**
**United States Attorney**


**S/Timothy R. Henwood**
**USDC No. 218608**
**Assistant United States Attorney**
U.S. Attorney's Office
Torre Chardon, Suite 1201
Carlos Chardón Ave.
Hato Rey, PR 00918
Tel. (787) 766-5656
Fax (787) 766-5326


**Certificate of Service**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the defendants.

At Hato Rey, Puerto Rico, September 6, 2006.

s/Timothy R. Henwood
U.S.D.C. No. 218608